**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-372 (JDB)** |
| **v.** | : | |
| | : | |
| **SHELLY VARNEY,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Shelly Varney to 50 days in jail, near the bottom of the Guidelines range of 0 to 6 months' incarceration, one year of supervised release,[1] $500 restitution, and the mandatory $50 in special assessments.

I.      **Introduction**

Defendant Shelly Varney, a 46-year-old HVAC sales coordinator, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[2]

---

[1] For multiple misdemeanor convictions, the court can impose a maximum of one year of supervised release on each count. 18 USC 3583(b)(3). Multiple terms of supervised release must run concurrently. 18 USC 3624(e).

[2] Although the Statement of Offense in this matter, filed on December 1, 2022, (ECF No. 8 at ¶ 6), reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate loss suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount

Varney pleaded guilty to one count of violating 18 U.S.C. § 641 (Theft of Government Property) and one count of 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds). As explained herein, a sentence of 50 days in jail, one year of supervised release, $500 restitution, and the mandatory $50 in special assessments ($25 for each of the two Class A misdemeanors to which she pleaded guilty) is appropriate in this case because: (1) Varney entered the Capitol building unlawfully; (2) she remained inside the Capitol for approximately 20 minutes; (3) during that time, she traveled to then-Minority Leader Kevin McCarthy's office, where she entered and remained less than one minute; and (3) a few days after January 6, upon realizing her and her husband's vulnerability to the nationwide federal investigation into January 6, she burned the American flag her husband stole from the Capitol and disposed of the stolen flagpole in a pond so as to obstruct that federal investigation. [3]

The Court must also consider that Varney's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed. Here, the facts of and circumstances of Varney's crime and her destruction of evidence warrant a sentence of 50 days in jail, one year of supervised release, $500 restitution, and the mandatory $50 in special assessments.

---

reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

[3] Varney's husband, Neil Ashcraft, was separately prosecuted. *United States v. Neil Ashcraft*, 22-cr-295 (CKK). On March 8, 2023, Judge Kollar-Kotelly sentenced Ashcraft to 80 days in jail followed by 36 months of supervised release (later amended to one year of supervised release) and ordered him to pay $2,000 in restitution and a $50 special assessment.

II.        **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 8 (Statement of Offense), at 1-7.

*Defendant Varney's Role in the January 6, 2021, Attack on the Capitol[4]*

On or about January 5, 2021, Defendant Shelly Varney and her husband, Neil Ashcraft, drove together from their home in Sanford, Florida, to Washington D.C. to protest the results of the 2020 presidential election.

On January 6, 2021, Varney, dressed in a gray hooded sweatshirt and black beanie hat and wearing a light gray backpack, and Ashcraft, who was wearing an orange backpack, were among the crowd of people who gathered near the Washington Monument and the Ellipse for the "Stop the Steal" rally. They both carried their cell phones. The photographs below depict how Ashcraft and Varney (outlined in yellow) appeared that day.

---

[4]   This factual narrative is based on the government's evidence, provided in discovery and summarized in part in the Statement of Offense, and on the pre-arrest statement made by Varney to FBI agents and Assistant United States Attorneys on December 2, 2021.




*Image 1 (left):  Instagram photograph of Ashcraft and Varney on January 6, 2021*
*Image 2 (right): Open-source photograph of Ashcraft and Varney on January 6, 2021*

Varney and Ashcraft left the rally before it ended and joined a large group walking to the U.S. Capitol grounds via Pennsylvania Avenue.  The Peace Circle is due west of the U.S. Capitol building and marks the end of Pennsylvania Avenue, N.W. When they arrived at the Peace Circle, Varney and Ashcraft saw barricades and a police presence blocking further progression down Pennsylvania Avenue. None of this deterred Varney.

At approximately 12:55 p.m., rioters overwhelmed that police perimeter. Within about a minute, rioters had surged from the Peace Circle into the ground-level plaza to the west of the U.S. Capitol building (the West Plaza). Ashcraft and Varney were present near the Peace Circle at around the time of the breach and reached the West Plaza minutes after the breach as part of this initial wave of rioters. There on the West Plaza, a vastly outnumbered group of police officers,

many of whom were wearing riot gear, was attempting to hold the mob at bay and prevent the rioters from entering the U.S. Capitol building itself. As part of this effort, officers formed shoulder-to-shoulder lines, with and without barricades, and deployed chemical irritants that created clouds of chemical smoke in the air on the West Plaza.  None of this deterred Varney either.

With Inauguration Day only two weeks away and the ceremony scheduled to take place on the west side of the U.S. Capitol building, the West Plaza was an active construction site as work was underway to build the Inauguration stage, stands, and supporting structures. As such, the West Plaza contained scaffolding in multiple locations and a media tower. At some point between 1:00 and 2:00 p.m., Ashcraft decided to climb up the scaffolding and gave Varney his orange backpack. Varney waited for Ashcraft on the West Plaza, wearing his orange backpack on the front of her chest and her gray one on her back.



*Image 3:  Varney waiting for Ashcraft on the West Plaza*

At approximately 2:45 p.m., Varney entered the Capitol building through the open Upper West Terrace Doors, which are ordinarily closed and not accessible to visitors.



*Image 4:  Varney (circled in yellow) entering the U.S. Capitol building at 2:45 p.m. through the
Upper West Terrace Doors[5]*

Varney roamed the Capitol building for approximately 20 minutes. After entering through
the West Terrace Doors, she walked straight down a hallway to the Rotunda, where she stayed for
approximately 13 minutes.



*Image 5:  Varney (circled in yellow) in the Rotunda*

---

[5] The timestamps on U.S. Capitol CCTV footage are rendered in Coordinated Universal Time
(UTC), which was five hours ahead of Eastern time on January 6, 2021.

While Varney was in the Rotunda, police officers worked to regain control of the room—and by extension, the entire Capitol building—by blocking off certain doors and trying to funnel the crowd out of the Rotunda.



*Image 6:  Varney (circled in yellow) in the Rotunda as police (outlined in white) gather in the opposite doorway*

Just before 3:00 p.m., Varney exited the Rotunda.



*Image 6:  Varney (circled in yellow) exiting the Rotunda*

She walked down a nearby hallway and entered then-Minority Leader Kevin McCarthy's office, a sensitive space, through the rear fire door.



*Image 7:  Varney (circled in yellow) entering then-Minority Leader McCarthy's office through the rear fire door.*

Varney exited Leader McCarthy's office less than a minute later and retraced her steps, returning to the chamber just outside the Rotunda.



*Image 8:  Varney (circled in yellow) on her cell phone outside the Rotunda for the second time*

At approximately 3:05 p.m., Varney exited the Capitol building through the East Rotunda Doors, also known as the Columbus Doors, placing her on the east side of the Capitol building, opposite of where she had entered.



*Photo 9:  Varney (circled in yellow) exiting the Capitol building through the East Rotunda Doors*

The next day, Varney and Ashcraft left Washington, D.C. by car to drive back to their home in Florida, taking the stolen American flag and flagpole with them.

*Varney's Interview with the FBI*

On April 28, 2021, an FBI Task Force Officer contacted Ashcraft at his home and attempted to interview him. Ashcraft invoked his right to counsel. Approximately seven months later, on December 2, 2021, Ashcraft and Varney—accompanied by counsel—participated in separate voluntary and extensive interviews with FBI agents and Assistant United States Attorneys. Neither had been charged at the time.

In addition to confirming all of the facts above, Varney described her actions and thoughts that were not captured on camera. Varney stated that when Ashcraft decided to climb up the scaffolding on the West Plaza, he not only handed her his orange backpack but also his cell phone,

which had no battery power remaining. Varney said that once Ashcraft ascended the scaffolding, she lost sight of him and had no way to contact him. For an unknown but substantial amount of time, she stayed where she was and waited for him to return. While Varney waited for Ashcraft, she spoke with a group of Oath Keepers, whom she observed wearing military-style vests (prior to January 6, Ashcraft had unsuccessfully tried to join the Oath Keepers).

Varney relayed that eventually she grew tired of waiting and searched for Ashcraft outside the Capitol. She did not find him. When Ashcraft still had not reappeared after approximately 45 minutes, Varney went looking for him inside the Capitol building. While roaming the Capitol, Varney checked her cell phone and found that she had multiple missed calls from unknown numbers. Varney called one of those numbers and the unknown person who answered told her that Ashcraft was outside and trying to reach her. Varney said she exited the Capitol soon after.

Once outside, Varney stated that she received a phone call from another unknown number. It was Ashcraft calling. He had borrowed an unknown person's cell phone and directed her to meet him at the base of the scaffolding.

Approximately 25 minutes later, at around 3:40 p.m., Varney and Ashcraft found each other on the West Plaza. In his hands, Ashcraft held an American flag and flagpole, which he admitted to Varney he had stolen from the Capitol building, specifically a room or hallway just off the Rotunda. Varney introduced her husband to several members of the Oath Keepers whom she had met, including one of the leaders of the Florida chapter, which Ashcraft had been trying to join. Ashcraft and Varney remained on the Capitol grounds for approximately 30 more minutes, speaking with the Oath Keepers and specifically discussing the next steps Ashcraft needed to follow to join them and become active in the Florida chapter.

On January 7, 2021, as they drove home to Florida, Varney said that she and Ashcraft contemplated and discussed the gravity of what they had seen and done at the U.S. Capitol the day before.

By January 8, 2021, Varney and Ashcraft realized that the FBI was conducting a nationwide search for people who had entered the U.S. Capitol building or committed other crimes on January 6, 2021, and that they were potentially targets of the investigation who could be identified and arrested. Varney and Ashcraft knew that the stolen flag and flagpole were evidence of a crime and did not want the FBI to find it in their possession. Consequently, Ashcraft asked his mother, who lived in a nearby town, to hold the stolen flag and flagpole. Ashcraft's mother initially agreed to do so but called Varney the next day and told Varney that she was uncomfortable retaining it.  Accordingly, Varney traveled to Ashcraft's mother's house, took possession of the stolen flag, and burned it at Ashcraft's mother's house, completely destroying the flag. Varney then took the stolen brass flagpole and threw it in a nearby pond or swamp.

Varney implicitly—but not explicitly—admitted that her actions were intended to destroy evidence, obstruct the FBI's investigation, and hinder any prosecution of Varney and/or Ashcraft

A few months after the interview, government counsel and counsel for Varney began discussing a plea agreement. Ultimately, Varney agreed to plead guilty via plea agreement without having first been charged or arrested.

*The Charges and Plea Agreement*

On November 15, 2022, the United States charged Varney by a two-count information with violating 18 U.S.C. § 641 (Theft of Government Property) and one count of 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds). ECF No. 1. On December 1, 2022, Varney pleaded guilty to the Information pursuant to a plea agreement. *See* Minute Entry Dec. 1,

11

2022. By plea agreement, Varney agreed to pay $2,000 in restitution to the Architect of the Capitol.[6] *See* ECF No. 9 at 8.

## III.       Statutory Penalties

Varney now faces sentencing on both the violations of 18 U.S.C. § 641 and 18 U.S.C. § 1752(a)(1)). As noted by the plea agreement and the U.S. Probation Office, Varney faces up to one year of imprisonment on each count, PSR ¶ 116, and a fine of up to $100,000 per count, *id.* ¶ 135. Varney must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As both offenses are Class A Misdemeanors, the Sentencing Guidelines apply. PSR ¶¶ 117, 124, 131, 137, 140; 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The PSR includes two errors, which result in a lower offense level than that to which the parties stipulated in the plea agreement; however, the errors do not result in a different guideline range than that to which the parties stipulated in the plea agreement.  First, the PSR does not

---

[6] This was a mistake by the government. Despite Varney's agreement to that sum, the government is only seeking $500 in restitution from Varney and asks the Court to modify its sentence accordingly.

include a separate Guidelines analysis for both counts—Counts One and Two—to which Varney pleaded guilty. *See* PSR ¶¶ 39-52. Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The PSR does not follow these steps. It concludes (*see* PSR ¶ 43) that Counts One and Two group but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

The second error in the PSR flows from the first error. The PSR asserts that the two offenses should be grouped under U.S.S.G. § 3D1.2(b), producing a total offense level of 6. PSR ¶¶ 44-52. The parties disagree. As noted in the plea agreement, the two offenses do <u>not</u> group under U.S.S.G. § 3D1.2(a) ("Counts involve substantially the same harm within the meaning of this rule … when counts involve the same victim and the same act or transaction"). *See* Plea Agreement, ECF No. 9 at p. 3. Here, the two offenses involve different victims—the Architect of the Capitol is the victim of the flag theft and Congress is the victim of the unlawful entry into the building. Accordingly, the counts do not group and instead generate an additional two levels, pursuant to U.S.S.G. § 3D1.4(a), which produces a total offense level of 8. *Id.*[7]

The parties agree that the appropriate Guidelines calculations are as follows:

Count One: 18 U.S.C. § 641 (Theft of Government Property)

---

[7] The government acknowledges that in *United States v. Mostofsky*, 21-cr-138-JEB, Judge Boasberg determined that Probation was correct to group these offenses. Judge Kollar-Kotely reached the same conclusion in Ashcraft's case.

| U.S.S.G. §2B2.1(a)(2) | Base Offense Level | +6 |
| | Total: | 6 |

Count Two: 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds)

| U.S.S.G. §2B2.3(a) | Base Offense Level | +4 |
| U.S.S.G. §2B2.3(b)(1)(A) | Restricted Building or Grounds | +2 |
| | Total: | 6 |

Grouping Adjustments
| U.S.S.G. § 3Dl.2 | *Conviction counts cannot be grouped.* | |
| U.S.S.G. § 3Dl.4 | *Use highest offense level and add units as appropriate.* | |
| | Highest Offense Level | +6 |
| U.S.S.G. § 3Dl.4(a) | Total 2 Units | +2 |
| | Total: | 8 |

| Acceptance of Responsibility (U.S.S.G. §3E1.1(a)) | -2[8] |
| **Total Adjusted Offense Level:** | **6** |

*See* ECF No. 9 at p. 3.

Ultimately, however, it makes no substantive difference whether the Court adopts the parties' or Probation's calculations: both the parties' grouping analysis and Probation's produce a Guidelines sentencing range of 0-6 months of incarceration. Based on a total offense level of either 8 or 6 and a criminal history category of I (based on zero criminal history points), the Guidelines range is 0-6 months in jail.[9]

---

[8] In paragraph 36, Probation applies a 2-level enhancement for obstruction of justice, pursuant to USSG §3C1.1. While the government does not *object* to Probation's finding of obstruction, the government is honoring the Guidelines calculation in the plea agreement and therefore is not *seeking* this enhancement.

Somewhat contradictorily, Probation has also applied the 2-level reduction for acceptance of responsibility, USSG §3E.1.1. Indeed, the Application Notes for USSG §3E.1.1, state that "[c]onduct resulting in an enhancement under §3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." *Id.* n.4. The Application Notes go on to say that "[t]here may, however, be extraordinary cases in which adjustments under both §3C1.1 and §3E1.1 may apply. Probation appears to believe that this is such a case.

[9] The Court could reach a different conclusion by following a mixed path. If the Court were (1) to adopt the parties' position that the counts do not group; (2) to agree with Probation that the 2-

**IV.      Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 50 days in jail, one year of supervised release, $500 restitution, and the mandatory $50 in special assessments.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy. *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 579 F.Supp.3d 1, 8 (D.D.C. 2021). While assessing Varney's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, contrary to Varney's suggestion, for a misdemeanor defendant like Varney, the absence

---

level enhancement for obstruction of justice applies; and (3) to reject the parties' and Probation's recommendation that it apply the 2-level reduction for acceptance of responsibility, the total adjusted offense level would be 10 and the Guidelines range would be 6-12 months of jail.

of violent or destructive acts is not a mitigating factor. *See* Def.'s Sentencing Mem., ECF No. 13, at 2. Had Varney engaged in such conduct, she would have faced additional criminal charges.

First, Varney chose to participate in a riot. She saw police officers and barricades at the Peace Circle, and she was only able to continue approaching the Capitol via Pennsylvania Avenue once rioters broke through them. She saw more police officers—many of them wearing riot gear—and barricades on the West Plaza. She observed police officers using chemical irritants to repel rioters and smelled the gas in the air. She saw blood on the ground and heard rumors that someone had been shot by the police inside the building. None of this deterred her. None of this caused her to leave the Capitol grounds. Instead, she went inside the building. While inside, she felt and smelled more pepper spray and chemical gas. That did not deter her either. She remained inside, only leaving when it suited her purposes.

Second, at the time Varney walked into the Capitol building, she knew that Congress was inside, working to certify the results of the 2020 presidential election. Varney must have understood that a mob of rioters breaking into the building would disrupt Congress's work. This did not deter her.

Further, while inside the Capitol, she entered then-Minority Leader Kevin McCarthy's office. Although she remained there less than one minute, rioters' entry into sensitive spaces within the Capitol risked harm to members of Congress and their staffs, some of whom were hiding in the Capitol.

Finally, Varney's conduct was significantly worse than most misdemeanor-only January 6 defendants. Her criminal conduct was not limited to unlawfully entering and occupying the Capitol. Unlike others, and in stark contradiction of any claim that she was acting as a patriot, Varney participated in the theft and destruction of an American flag and brass flagpole. While it

may have been her husband, not she, who initially removed the flag and flagpole from a hallway near the Rotunda, Varney is just as guilty as he in transporting the flag and flagpole to Florida and then destroying the evidence. Ashcraft showed her the stolen flag and flagpole shortly after they reunited. Instead of making any effort to return the flag and flagpole, Varney and Ashcraft jointly brought them home to Florida, ostensibly as trophies or souvenirs, even while they explicitly discussed the seriousness of the events at the Capitol.

When they became aware that the FBI was investigating people who had entered the Capitol on January 6 or committed other crimes in association with the riot, they did not turn themselves in or make an effort to return the flag. Instead, they tried to hide it, and with it their own criminal complicity, at Ashcraft's mother's house.

When that effort failed, Varney did not surrender the flag then either, or even tried to hide it elsewhere. Instead of feeling remorse for her actions and trying to rectify them, Varney amped up the obstruction. She did not return the flag and flagpole to the government. She destroyed them, first by burning the flag completely and then by hurling the flagpoles into a pond or swamp. Her goal was not to do the right thing but rather to destroy evidence in the hopes that the FBI and police would never discover what she and Ashcraft had done. These actions support viewing Varney as a worse actor than most other misdemeanor-only January 6 defendants and imposing the recommended term of incarceration.

Varney's conduct is somewhat mitigated by her candor during her pre-arrest voluntary FBI interview. Although she minimized the significance of the Capitol riot and the actions of other rioters (for example, she described entering the Capitol building as "easy" and "like any tour day," descriptions at odds with every video of the day's events), Varney appears to have described the facts forthrightly. In other words, while her *characterizations* of the day's events were shaded and

dubious, her recitation of the actual facts seems to have been honest and unsparing. Varney's description of her actions on January 6, 2021, included conduct (such as conspiring to hide/burn the stolen flag and dispose of the flagpole) that the government did not know about, let alone have captured on video or in photographs. She appears to have truthfully answered the questions she was asked about the Oath Keepers and her and Ashcraft's involvement with them. She readily identified herself in pictures. And she pleaded guilty via a pre-charge plea agreement.

### B. Varney's History and Characteristics

Varney has no criminal history and has maintained a steady employment history. She is the mother of three children, all of whom she lives with and cares for. According to the PSR, "The defendant explained if she and her husband are sentenced to custodial sentences in their respective cases [Varney's eldest child] will be 18 years old at the time of their sentencing, so he will care for the defendants' two minor children, along with assistance from the defendant Varney's mother." PSR ¶ 69.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188 (RDM), Tr. At 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future

potential rioters—especially those who intend to improperly influence the democratic process—
that their actions will have consequences. There is possibly no greater factor that this Court must
consider.

*Specific Deterrence*

Varney's actions – during and after the riot – demonstrate the need for specific deterrence.
First, as discussed above, she failed to heed repeated clear signs that her presence on the Capitol
grounds, let alone her entry into the Capitol building itself, was unlawful. Given that the barricades,
police presence, and use of non-lethal crowd control measures—such as chemical irritants—did
not deter her, a significant sentence is warranted.

The evidence concerning Varney's acceptance of responsibility cuts in both directions. On
one hand, in order to evade arrest and prosecution for her and her husband's conduct on January
6, she purposefully hid and then destroyed evidence—including burning an American flag. On the
other hand, after being approached by FBI agents and securing the advice of counsel, Varney gave
a voluntary full confession, which included admitting details and criminal conduct, such as the
destruction of the flag and flagpoles, about which the FBI was unaware at the time. She then
pleaded guilty to the instant offenses via plea agreement, without having first been charged by
complaint and arrested.

Finally, Varney described entering the Capitol as "easy" and "like any normal tour day."
This is alarming. There was nothing normal about January 6 or the scene outside and inside the
Capitol when Varney entered. She did not enter the Capitol with a tour group, through a main
entrance after being screened for weapons. Her entry was only possible after rioters broke through
barricades and police lines. She entered through a pried-open side door that is normally locked.
She did not pass through a magnetometer. And once inside, she smelled and felt the same pepper

spray she had experienced outside and saw uniformed police officers attempting to corral the rioters. None of this mattered to Varney, and a significant sentence is necessary to deter her from future unlawful conduct.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[10] This Court must sentence Varney based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Varney has pleaded guilty to one count of violating 18 U.S.C. § 641 (Theft of Government Property) and one count of 18 U.S.C. § 17524(a)(1) (Entering and Remaining in a Restricted Building or Grounds). Both offenses are Class A misdemeanors, to which the Sentencing Guidelines and the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), apply.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the

---

[10]  A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).")." Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Here, the pool of comparable cases is severely limited.

So far, only 8 defendants convicted of violations of 18 U.S.C. § 641 have been sentenced, although there have also been a few cases with other offenses of conviction that involved somewhat similar behavior. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the cases described below provide the best available comparisons to the relevant sentencing considerations in this case. *See United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006) (In considering disparity, a judge cannot "consider all of the sentences not yet imposed . . . The most a judge can do is consider those other sentences that do exist.").

The most analogous case is Ashcraft's, given that he was charged with and pled guilty to the same two crimes as Varney, and many of the facts of his case overlap with the facts in Varney's case. In *United States v. Neil Ashcraft*, 22-cr-295 (CKK), Judge Kollar-Kotelly sentenced Ashcraft to 80 days of incarceration followed by 36 months of supervised release (later amended to one year of supervised release). Ashcraft's conduct was worse than Varney's, however. When Ashcraft scaled the scaffolding on the West Plaza, he exhorted other rioters to push forward and fight, and he used a knife to destroy the white sheathing covering the scaffolding, which facilitated the riot by enabling rioters to see into and though the scaffolding. Also unlike Varney, Ashcraft entered the Capitol just one minute after it was first breached by rioters who broke through the windows on either side of the door through which Ashcraft entered; used a metal pole he found to bang on the floor of the Capitol building and encourage other rioters; kicked an interior door, leaving a footprint on it; stole water from a jug that did not belong to him (and likely belonged to the government, not another rioter); stole the American flag and flagpole belonging to the United States government; posed for photographs inside the Capitol building; and remained inside the Capitol for approximately 41 minutes. Consequently, Ashcraft deserved a significantly harsher sentence than Varney should receive, even though they jointly transported the stolen flag back to Florida and conspired to obstruct the FBI's investigation by hiding and then destroying it.

The Court should also consider the sentence imposed in *United States v. Ryan Suleski*, 21-cr-376 (RDM). There, the defendant pleaded guilty to the same two offenses as Varney, 18 U.S.C. § 641 and 1752(a)(1). Suleski—a former member of the U.S. Army who had received a Bad Conduct discharge—entered the U.S. Capitol building through the Upper West Terrace Door at 2:33 p.m. [11], and did so despite observing and experiencing the police using chemical agents and

---

[11] This is the same door through which Varney entered the Capitol 12 minutes later.

rubber bullets to keep rioters at bay. While inside, Suleski watched and video recorded as rioters violently attacked the police officers who were blocking the Rotunda doors on the east front of the Capitol and keeping the outside rioters from entering. Suleski then wandered the hallways around the House Gallery with other rioters and attempted to open closed and locked doors, before ultimately rifling through and stealing papers from outside an office. In total, Suleski spent approximately 11 minutes inside the U.S. Capitol building. Afterward, while still on the Capitol grounds, he gave an interview to a BBC reporter in which he celebrated the rioters' actions, including their violence. When interviewed by the FBI prior to his arrest, Suleski not only lied about the violence that he saw and about stealing papers from the building, he also actively concealed his cell phone from law enforcement officials, despite being presented with a search warrant for the phone. For the above conduct, Judge Moss sentenced Suleski to 60 days' imprisonment, one year of supervised release, a $5,000 fine, and 60 hours of community service.

The government is recommending that the Court impose a sentence that is approximately half the length of Suleski's because Suleski's conduct was worse than Varney's. Unlike Varney, Suleski watched and recorded violence against police officers, which is a substantial aggravating factor. He penetrated an even more sensitive area—the hallways surrounding the House Gallery, where lawmakers and staff who had been trying to carry out the nation's business were then sheltered in place, some fearing for their lives. He stole items from the Capitol (papers) himself, rather than serving as an accomplice after the initial theft had already occurred. He celebrated the rioters' violence to a reporter. And he lied to the FBI. Finally, the government only learned of Varney's most egregious conduct—hiding then destroying the flag and flagpole—because Varney herself volunteered it. While this confession does not absolve Varney of her crimes, it is substantially mitigating when comparing her conduct to Suleski's.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Varney to 50 days in jail, one year of supervised release, $500 restitution, and the mandatory $50 special assessment. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime. The government recommends that this Court set a self-surrender date that will have the effect of staggering, in whole or in part, the sentences imposed on Varney and Ashcraft.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   _/s/ Michael M. Gordon_____
     MICHAEL M. GORDON
     Florida Bar No. 1026025
     Assistant United States Attorney, Detailee
     601 D St., NW
     Washington, D.C. 20001
     Tel. No. (813) 274-6370
     michael.gordon3@usdoj.gov